# In the United States Court of Federal Claims

|  |  |
|---|---|
| MINE DETECTION AND DOG CENTER, *Plaintiff,* v. THE UNITED STATES, *Defendant.* | No. 22-1313C (Filed: April 2, 2024) |

*Jeffrey Charles Nelson*, Maglio Christopher & Toale, P.A., Washington, DC, for Plaintiff.

*Daniel Bertoni*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge.*

      This case arises from the United States' military involvement in and withdrawal from Afghanistan. For nearly two decades, the Government provided funding to the Afghan state. Compl. ¶ 9, ECF No. 1. Afghanistan used the money, in part, to pay third-party contractors to provide security services—contracts which the United States approved, but to which it was not a party. *Id*. ¶ 11–15. Plaintiff Mine Detection and Dog Center ("MDDC") entered into one of these contracts with the Afghan government. *Id*. ¶ 19–20. MDDC also claims it had a second, implied contract with the United States to guarantee payment for its work and insure any potential losses. *Id*. ¶ 19–20, 63. MDDC alleges that it suffered serious financial harm after the Taliban's takeover of the country. *Id*. ¶ 56, 58. According to its Complaint, MDDC was not paid for months of work, and the Taliban "expropriated" its property. *Id*. ¶ 56, 58–83. MDDC seeks compensation from the Government for these losses. *Id*. ¶ 57–61.

      Thus, this case asks what facts a third-party contractor working on a federally-funded project must allege to state a claim that it had a separate, implied contract with the United States. Here, the Government argues as a matter of law that there was no contract, implied or otherwise, and moves to dismiss for lack of jurisdiction and failure to state a claim. Mot. to Dismiss, ECF No. 11. For the reasons below, the Court **GRANTS** the Motion to Dismiss.

### I.    Factual Background

      MDDC's Complaint alleges the following facts, which for purposes of this Motion to Dismiss the Court accepts as true. For about twenty years, the U.S. Department of Defense's Combined Security Transition Command-Afghanistan ("CSTC-A") operated in Afghanistan.

Compl. ¶ 9–12.  CSTC-A collaborated with the Afghan Ministry of Defense ("MOD") and Ministry of Interior ("MOI")[1] on "budgeting processes, acquisition planning processes, procurement, financial management, and contract management and oversight."  *Id.* ¶ 9.  CSTC-A ensured that the Afghan ministries had "standard operating procedures" and "adequate fiscal controls," and also "safeguard[ed] U.S. funds."  *Id.* ¶ 10–11.  The Afghanistan Security Forces Fund ("ASFF") provided direct funding to the MOD and MOI.  Compl. ¶ 9–10.  CSTC-A "approved and facilitated all expenditures contracted by [MOD] and [MOI] in support of the [Afghan National Self Defense Force]."  *Id.* ¶ 11.

In June 2021, as the United States began withdrawing from Afghanistan, the Department of Defense transferred CSTC-A's responsibilities to the Defense Security Cooperation Management Office-Afghanistan.  *Id.* ¶ 12.  In August 2021, the Taliban took control of Afghanistan and the United States military left the country.  *Id.* ¶ 56.

### A. The MOI Negotiates a Contract with MDDC.

After a truck bomb exploded in May 2017 in Kabul's Green Zone, a secured region housing ministerial buildings and command posts for the U.S.-led military coalition, Afghan officials decided to hire a bomb-sniffing dog ("K9") provider.  *Id.* ¶ 14–16.  The MOI asked CSTC-A to help identify and pay a contractor to supply the K9 services.  *Id.* ¶ 15–17.  Plaintiff MDDC is a nongovernmental organization that uses explosive detecting dogs for humanitarian and security related projects.  *Id.* ¶ 5–8.  In August 2017, MDDC "was chosen" and signed a contract with the MOI providing for monthly payments.  *Id.* ¶ 18.  During contract negotiations, MDDC expressed concerns to CSTC-A that the U.S. government was not a party to the contract, as MDDC struggled to get paid for its prior MOI work.  *Id.* ¶ 19.  In response, the Complaint alleges that "to fill the urgent need for K9 teams at Green Zone checkpoints, CSTC-A officials promised payment to [MDDC] on behalf of the United States government and in consideration for that promise, [MDDC] entered into the contract."  *Id.* ¶ 20.

### B. MDDC Performs and CSTC-A Intervenes When Payment is Delayed.

Problems soon arose after the contract began in August 2017.  MOI did not pay MDDC for nearly the first four months.  *Id.* ¶ 22.  When MDDC asked CSTC-A for help, the officer responsible for Green Zone security, Lieutenant Commander Clifford Youngberg, responded that CSTC-A would "continue to push from our side."  *Id.*  He explained that the "holdup" was caused by a procedural issue at the Afghan Ministry of Finance ("MOF").  *Id.*  MDDC alleges that but for this "guarantee," it would not have continued to work.  *Id.*  Eventually, MOI paid MDDC on December 24, 2017, and Lt. Cdr. Youngberg confirmed that the "first payment has been issued to [MDDC] for the K9 teams."  *Id.* ¶ 23.

MOI continued to be late on payment, and MDDC continued to ask CSTC-A for help.  *Id.* ¶ 24.  In January 2018, Lt. Cdr. Youngberg's replacement at CSTC-A, Lieutenant Commander Mark Kerr, advised MDDC to use a different billing code.  *Id.*  MDDC contacted Lt. Cdr. Kerr again when MOI explained it could not bill through that code, requesting "assistance to clear the path" for the next payment.  *Id.*  On March 3, 2018, Lt. Cdr. Kerr emailed MDDC back, explaining that "the money has worked its way through the system and is available to bill against."  *Id.* ¶ 25.  He offered to make "any additional queries on [MDDC's] behalf."  *Id.*

---

[1] The Court will fully capitalize the initials of MOD and MOI except when quoting MDDC's Complaint, in which some letters are uncapitalized.

Later, after MDDC raised the payment issues again, Lt. Cdr. Kerr agreed "that this situation requires additional attention and possible [sic] some expedited payment processes—which will be my suggestion to my supervisors." *Id*. He added, "hopefully your email and my efforts will be rewarded with success." *Id*. ¶ 26.

### C. MOI Extends and Modifies MDDC's Contract, and CSTC-A Continues to Assist with Payment.

MDDC continued to work despite these payment issues, and even extended and modified its contract with MOI several times. *Id*. ¶ 28–36, 43–49. In June 2018, a CSTC-A Requirement-Procurement Approval Board ("PAB") composed of representatives from CSTC-A and MOI approved a two-year extension of MDDC's contract. *Id*. ¶ 28; *see also* Compl. at 20–26. MDDC agreed to the contract extension because of CSTC-A's assurances that it allocated funds for the contract. Compl. ¶ 30.

In January 2019, a CSTC-A official asked MDDC to add more K9 units to the contract and MDDC agreed to do so. *Id*. ¶ 31. In August 2019, a second CSTC-A official requested MDDC add even more K9 teams. *Id*. ¶ 32. A "PAB Project Approval Form" from August 19, 2019, memorialized PAB's approval of funding for the addition and a contract extension. Compl. at 28. The form did not mention MDDC by name and identified an MOI official as the "requirement owner." *Id*. After PAB approved the modification and extension, a CSTC-A official told MDDC that MOI's contract extension would be considered a "Tier 1 priority" and provided a copy of CSTC-A's "commitment to fund." Compl. ¶ 33. MDDC then signed a contract modification with MOI because it considered this email and document a "guarantee of payment." *Id*. ¶ 34.

### D. MOI and MDDC Sign a Final Contract Extension, and CSTC-A Assists Until the U.S. Withdrawal.

Compensation issues continued into 2020, as MOI failed to pay MDDC for the final six months of its contract. *Id*. ¶ 42. On November 5, 2020, MDDC asked CSTC-A's Section Head Scott Adams for help. *Id*. ¶ 36. Mr. Adams responded by stating that he would "address this issue with my MOI counterparts and work with them to get you paid soonest." *Id*. ¶ 37. On December 14, 2020, MDDC told Mr. Adams it would stop working on December 21, 2020, unless it was paid. *Id*. ¶ 39. MDDC added that despite the delays, "[MDDC] has signed [a] contract with MOI because of CSTC-A and international community assurance." *Id*. On December 20, 2020, Adams said he "discussed the status of the contract with MOI," and "expressed [CSTC-A's] concern that the back pay issue had not been resolved." *Id*. ¶ 40. Mr. Adams told MOI that CSTC-A "supported" extending the contract. *Id*. When the contract with MOI expired on December 20, 2020, MDDC continued to perform. *Id*. ¶ 42.

At the same time, MDDC and MOI were negotiating to renew the contract. *Id*. ¶ 43–45. On December 23, 2020, MDDC emailed Mr. Adams stating that it "would require CSTC-A's commitment and continuous engagement" in the payment process once the contract was renewed. *Id*. ¶ 43. Mr. Adams responded that he would "monitor the status" of the renewed contract. *Id*. ¶ 44. MDDC signed a contract renewal with MOI for the period December 21, 2020, to October 22, 2021. *Id*. ¶ 45, 49. When the backpay issues continued, MDDC complained to Mr. Adams, who in response convened an interagency meeting with

Afghanistan's National Procurement Authority, MOI, and CSTC-A. *Id*. ¶ 46–47. Shortly after, MOI paid MDDC. *Id*. ¶ 49.

Unfortunately for MDDC, payment delays persisted up to the United States' withdrawal from Afghanistan and the Taliban's takeover of the country. On July 8, 2021, MDDC emailed Mr. Adams' replacement, Keith Gudgel, stating it had not been paid in six months. *Id*. ¶ 50. Mr. Gudgel responded that he would "inquire" regarding the payment issues. *Id*. MDDC kept working without pay. *Id*. ¶ 52–53. On August 15, 2021, MDDC informed Mr. Gudgel it remained unpaid. *Id*. ¶ 53. The next day, Mr. Gudgel explained that it was Afghanistan's responsibility to pay, not the United States. *Id*. ¶ 54. In response, MDDC stopped working. *Id*. ¶ 55. On the same day, the Taliban took over the Green Zone and "expropriated" MDDC's property, including 88 explosive detecting dogs, 304 dog kennels, 36 guard booths, 12 automobiles, and 36 containers. *Id*. ¶ 56, 59.

## II.     Procedural Posture

On September 16, 2022, MDDC filed suit against the United States, alleging breach of an implied-in-fact contract to guarantee payment and protect MDDC against political and credit risks of nonpayment. *Id*. ¶ 62–83. MDDC avers it is owed compensation for seven months and twenty-four days of performance, as well as damages arising out of the Government's failure to guarantee payment. *Id*. ¶ 58. MDDC also claims damages for equipment that the Taliban allegedly "expropriated" based on the "U.S. government's breach of its contract guarantee," and lost profits for the remainder of the 2020-2021 contract. *Id*. ¶ 60. In total, MDDC alleges damages of "no less than $7,453,590." *Id*. ¶ 61.

The Government moves to dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim. Mot. to Dismiss. It contends that 1) MDDC failed to establish foreign-plaintiff jurisdiction under the Reciprocity Act; 2) MDDC did not plead an implied-in-fact contract with the United States; 3) MDDC neglected to exhaust administrative remedies under the Contract Disputes Act; 4) the Government's liability is limited by the sovereign acts doctrine; and 5) MDDC did not plead a guarantee against political and credit risks of nonpayment under the Arms Export Control Act. *Id*. MDDC's response to the dismissal motion included a declaration addressing reciprocity jurisdiction. Pl.'s Am. Opp'n, ECF No. 24. The Government replied in support of its Motion to Dismiss on September 1, 2023. ECF No. 25. Additional briefing on this issue concluded on February 5, 2024. ECF No. 39.

## III.    Legal Standards

### A.     Jurisdiction

The Tucker Act grants this Court "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). "To satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must identify and plead a[n] . . . independent contractual relationship that provides a substantive right to money damages." *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 153 (2013), *aff'd*, 741 F.3d 1380 (Fed. Cir. 2014). Implied-in-law contracts are not within the Court's jurisdiction. *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996). When the plaintiff is a foreign individual, it must also meet the requirements of the Reciprocity Act to

pursue its claims before this Court.  28 U.S.C. § 2502; *see, e.g.*, *Ravi v. United States*, 158 Fed. Cl. 775, 781 (2022).

        **B.**        **Motion to Dismiss Under Rule 12(b)(1) and 12(b)(6)**

The Government moves to dismiss the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim.  Mot. to Dismiss; *see also* Rules of the Court of Federal Claims ("RCFC") 12(b)(1), (b)(6).  In determining jurisdiction under 12(b)(1), "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint.  *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003).

Dismissal under 12(b)(6) is appropriate "when the facts asserted by the claimant do not entitle [it] to a legal remedy."  *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019).  Plaintiff must allege sufficient facts to draw a reasonable inference that the Government is liable.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  The court must assess the factual allegations after excising conclusory or formulaic components.  *See, e.g.*, *Bussie v. United States*, 96 Fed. Cl. 89, 95 (2011).  The court should determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Government argues that Plaintiff failed to sufficiently plead facts showing an implied contract and also to qualify for subject-matter jurisdiction under the Reciprocity Act.  Whether a plaintiff has pled a valid implied contract with the government is a threshold jurisdictional question.  *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1294 (Fed. Cir. 2022) ("[F]or purposes of Tucker Act jurisdiction, the government consents to be sued only by those with whom it has privity of contract.").  This subject-matter jurisdiction inquiry is "inextricably intertwined" with the merits of the 12(b)(6) motion to dismiss on the same grounds, "and the former cannot be resolved without considering and deciding (at least in part) the latter."  *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000).

Since the Court finds MDDC failed to plead an implied contract, it does not address the Reciprocity Act because "the appropriate disposition of the case would be the same as if we had determined that [the court] lacked jurisdiction" under the Reciprocity Act and the Tucker Act: "dismissal of the complaint."  *Id.*; *see also Riviera Drilling and Expl. Co. v. United States*, 61 Fed. Cl. 395, 400 (2004).  *Cf. Llamera v. United States*, 15 Cl. Ct. 593, 602 n.13 (1988) (declining to address Reciprocity Act issues when finding plaintiff "cannot otherwise secure a judgment in [its] favor in this court"); *Al-Qaisi v. United States*, 103 Fed. Cl. 439, 443 n.3, *aff'd*, 474 F. App'x 776 (Fed. Cir. 2012) ("Because the case may be resolved on other jurisdictional grounds, the court does not need to reach the reciprocity issue."); *Wickramaratna v. United States*, No. 21-2342C, 2022 WL 1124872, at *3 n.5 (Fed. Cl. Apr. 15, 2022), *aff'd*, No. 2022-1786, 2022 WL 17495907 (Fed. Cir. Dec. 8, 2022) ("[T]he Court need not address [whether plaintiff satisfies the Reciprocity Act] because . . . Plaintiff's complaint must be dismissed for . . . failure to state a claim for which relief may be granted.").

**IV.     Discussion**

    **A.     MDDC Fails to Plead an Implied-in-Fact Contract Because it Does Not Allege Facts Sufficient to Show the Government's Intent to Contract.**

Count I of the Complaint alleges breach of an implied-in-fact contract to guarantee payment to MDDC for security services.  Compl. ¶ 62–71.  An implied-in-fact contract is "founded upon a meeting of minds and is inferred as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting *Hanlin v. United States*, 316 F.3d 135, 1328 (Fed. Cir. 2003)).  The pleading requirements for an implied-in-fact contract with the government are the same as those for an express contract.  *Id*.  Plaintiff must allege facts allowing the court to infer: 1) mutuality of intent to contract; 2) consideration; 3) an unambiguous offer and acceptance; and 4) actual authority on the part of the Government's representative to contractually bind the Government.  *See Turping*, 913 F.3d at 1065; *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003).

"As a threshold condition for contract formation," MDDC must show an "objective manifestation of voluntary, mutual assent" by the Government.  *Turping*, 913 F.3d at 1065.  The manifestation of mutual assent to an exchange usually takes the form of an offer or proposal by one party, followed by an acceptance by the other party.  *Anderson,* 344 F.3d at 1353.  And while an express offer and acceptance may be absent in an implied contract, "the parties' conduct must indicate mutual assent."  *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 537 (2003), *aff'd sub nom. AG Route Seven P'ship v. F.D.I.C.*, 104 F. App'x 184 (Fed. Cir. 2004).  Without mutuality of intent, an implied contract claim cannot proceed.  *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003).

In assessing intent to be bound, courts look to the "surrounding circumstances."  *Turping*, 913 F.3d at 1065.  This includes direct representations between the parties, oral or written, that convey promissory intent.  *See, e.g.*, *Loc. Initiative Health Auth. for L.A. Cnty. v. United States*, 142 Fed. Cl. 1, 17 (2019) (finding intent to be bound in regulations that "use[d] unequivocal promissory language leading [plaintiff] to reasonably believe that they would be repaid").  Courts also consider the parties' course of conduct with each other, including any contract negotiations, the nature of any ongoing relationship between parties, and whether one party provided the other benefits.  *See, e.g.*, *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998); *Anderson*, 344 F.3d at 1353–58; *Chavez v. United States*, 18 Cl. Ct. 540, 545 (1989).  Additionally, "a contract may arise as a result of the confluence of multiple documents" that taken together show "a clear indication of intent to contract."  *D & N Bank*, 331 F.3d at 1377.

    **1.     The Alleged "Guarantees" and "Assurances" from U.S. Officials Are Insufficient to Show Mutuality of Intent.**

MDDC argues that CSTC-A officials' alleged "promises," "guarantees," and "assurances" constitute offers or inducements evidencing the Government's intent to be bound.  *See* Compl. ¶ 19–20, 22, 25, 27, 30, 34, 38, 41–42, 45, 48, 52; Pl.'s Am. Opp'n at 22.  MDDC claims that the Government intended to become MDDC's guarantor: "CSTC-A officials *promised payment* to [MDDC] on behalf of the United States government and *in consideration* for the promise, [MDDC] entered into the contract." *Id*. ¶ 20 (emphasis added).  However, MDDC provides only two supporting facts: there was an urgent need for K9 teams, and MDDC

6

was reluctant to contract with MOI without the United States as an express party because its bills had previously gone unpaid.  *Id*. ¶ 19–20.

These facts are not enough to infer that the United States intended to enter a contract as a guarantor.  MDDC does not allege that CSTC-A's promise of payment addressed MDDC's concerns, or that MDDC's participation was conditional on CSTC-A's guarantee.  *Id*. ¶ 16–20. *Cf. Anderson*, 344 F.3d at 1353 (citing Restatement (Second) of Contracts § 22 ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party.")).  Plaintiff also does not contend that CSTC-A promised to pay MDDC directly if MOI did not.  On its face, the "promised payment" language is equally consistent with CSTC-A's preexisting responsibility to fund and administer MOI's express contracts.  *See, e.g.*, Compl. ¶ 15–18; Pl.'s Opp'n at 8–9, 23.  MDDC must allege at least some facts to show that this alleged promise constitutes the meeting of the minds to be bound in this particular contract of guarantee, rather than a "formulaic recitation of the elements" of a contract.  *Iqbal*, 556 U.S. at 678.

Similarly, MDDC describes subsequent statements from CSTC-A officers as "guarantees" and "assurances" evidencing CSTC-A's intent to contract.  *See* Compl. ¶ 22, 25, 27, 30, 34, 38, 41–42, 45, 48, 52.  This legal conclusion is insufficient without well-pled facts. *Iqbal*, 556 U.S. at 664.  The purported statements suggest a general interest in seeing MDDC get paid, but not that CSTC-A controlled whether payment would, in fact, be made.  *See, e.g.*, Compl. ¶ 22 (stating that CSTC-A would "*continue to push* from our side"; "*hopefully* your email and my efforts will be rewarded with success"), ¶ 37 ("[CSTC-A] would address this issue with my MOI counterparts and *work with them to get you paid*"), ¶ 50 ("Gudgel . . . *would inquire* within CSTC-A regarding [MDDC's] payment issues.") (emphasis added).  Similarly, Mr. Adams' statements during MDDC's December 2020 contract negotiations convey only a commitment to "monitor the status" of a renewed contract rather than a promise to guarantee payment.  Compl. ¶ 43–44.

These "[e]xpression[s] of intention or general willingness to do something on the happening of a particular event or in return for something to be received do[] not amount to an offer" sufficient to show the Government's intent to be bound.  *Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1, 23 (2016), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 1341 (Fed. Cir. 2017) (citing *Bogley's Estate v. United States*, 514 F.2d 1027, 1032–33 (Ct. Cl. 1975)).  Without concrete promissory language, these statements from Mr. Adams and other CSTC-A officers "suggest no more than a desire, or a general willingness, to see" MDDC get paid and the Green Zone protected—but not an intent to be bound in contract to make it so.  *Sin Hang Lee v. United States*, 142 Fed. Cl. 722, 731–32 (2019).  *Cf.* Restatement (Second) of Contracts § 2 cmt. f ("A promise must be distinguished from a statement of opinion or a mere prediction of future events.").  In addition, the fact that Mr. Adams "never denied, refuted, or disclaimed [MDDC]'s assertion that CSTC-A provided guarantees," Compl. ¶ 41, does not transform his silence into voluntary assent.  *Bell/Heery v. United States*, 739 F.3d 1324, 1334 (Fed. Cir. 2014) ("Silence in and of itself is not sufficient to establish a demonstrated acceptance.").

Other statements MDDC relies on to show "guarantees" are, in fact, only instructions or status updates on the billing process.  *See, e.g.*, Compl. ¶ 25 ("the money has worked its way through the system and is available to bill against"), ¶ 47 (CSTC-A "met with MOI to discuss the status of [MDDC's] back pay").  Instructions, assistance, or directions do not allege intent to be

bound.  *See, e.g.*, *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 785 (2015) ("mere solicitations, invitations[,] or instructions from the [g]overnment are not offers to contract") (internal citations omitted).  Nor do CSTC-A's descriptive updates or explanations of the payment process express intent.  *See C & L Grp., LLC v. United States*, 140 Fed. Cl. 750, 756 (2018) (finding statements from agency to plaintiff contractor that "subject funds [were] reserved" and "[c]ontract payments [would be] approved . . . and disbursed" did not allege an intent to contract).  *Cf. Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982) ("No obligation to a third party is created even when the language in the contract provides . . . 'funds have been reserved by the Government and will be available to effect payment . . . .'").

      MDDC relies on *Laudes Corp. v. United States*, 86 Fed. Cl. 152 (2009).  *See* Pl.'s Am. Opp'n at 24, 27–28.  The *Laudes* court rejected a motion to dismiss a contractor's complaint alleging that the United States induced it into signing contracts with the Iraqi government by guaranteeing payment.  *See Laudes*, 86 Fed. Cl. at 156–58; *see also* Pl.'s Am. Compl., *Laudes Corp. v. United States*, No. 08-121C (Fed. Cl. Oct. 8, 2008), ¶ 47, ECF No. 14-1 ("To allay Laudes' concerns, as an inducement to sign the contract, [Department of Defense] officials . . . repeatedly orally assured Laudes that it would receive payment for its work because [they] would facilitate and obtain payment for Laudes" from Iraq's Ministry of Defense).

      However, unlike the instant case, the *Laudes* complaint provided specific allegations that the United States entered a contract with the plaintiff.  For example, the plaintiff alleged that the United States initiated and prepared the contract specifications.  86 Fed. Cl. at 155–56.  No Iraqi officials negotiated the contract; indeed, it was printed on a General Services Administration contracting form and stated that it was issued by the Department of Defense Project Contracting Office ("PCO").  *Id*. at 156–57.  PCO officials solicited the bid from Laudes directly, "pressed" it to submit a proposal, and emphasized the contract's importance to the United States in an email that said "IT SHOULD BE UNDERSTOOD THAT THERE IS NO GREATER IMPORTANCE TODAY IN ANYONES [sic] WORK WORLD . . . THAN THIS REQUIREMENT.  PLEASE PRICE AND PLAN ACCORDINGLY." *Id*. at 156.  Later, when Iraq failed to pay, PCO officials explicitly assumed responsibility for ensuring eventual payment.  *Id*. at 158 (alleging PCO officials stated "one of [PCO's] remaining responsibilities . . . [is to] ensure that your firm is paid timely and without delay by the MOD"; that PCO would "ensure fair payment of the monies owed once payment from MOD is seen as impending"; and that "[PCO] assumes direct authority over the process of payment and the responsibility of deficiencies.").

      MDDC does not allege any analogous facts.  It was Afghan government authorities, not United States officials, who determined there was a need for K9 teams at Green Zone checkpoints and initiated the contracting search.  Compl. ¶ 15.  MDDC does not contend that CSTC-A helped draft the initial contract.  *Id*. ¶ 15–20.  And other than citing general statements supporting contract renewal, MDDC's Complaint does not allege that the United States expressed a strong need for MDDC's continued performance.  Compl. ¶ 19–20, 40–45.  Importantly, the original 2018 and 2021 contract renewal agreements MDDC attached to the Complaint were originally written in Pashto (an official Afghanistan language), printed on Islamic Republic of Afghanistan letterhead, and listed MOI and MDDC as the contracting

parties.  Compl. at 25–26, 33–34.  The United States is entirely absent from all of the contract documents.  *Id*. at 22–26, 30–34.[2]

In *Laudes*, United States officials explicitly assumed a role in providing payment.  86 Fed. Cl. at 157–58.  By contrast, as discussed above, CSTC-A officials' alleged statements are supportive but vague as to responsibility for eventual payment.  Finally, *Laudes* has limited bearing on the issue of mutuality because that court did not address whether any of the four required elements of a contract were present—it only narrowly ruled that a separate defense to formation did not apply.  *Laudes*, 86 Fed. Cl. at 162–63.  However, even if *Laudes* found that the Government intended to contract, MDDC's Complaint is bereft of any facts to find this case sufficiently analogous.

### 2. CSTC-A's Conduct as Alleged is Insufficient to Show Intent.

Since an implied contract "is inferred, as a fact, from conduct of the parties," *City of Cincinnati*, 153 F.3d at 1377, MDDC asks this Court to consider the Government's conduct as a whole.  Pl.'s Am. Opp'n at 21–22.  MDDC claims the Government's repeated involvement in the contracting and payment process from 2017-2020 shows its intent to guarantee payment for the 2020-2021 contract.  *Id*.  MDDC argues that three categories of conduct evidence intent to guarantee payment: 1) CSTC-A committed funding for the K9 contracts, and actively managed and facilitated the payment process; 2) CSTC-A played a role in creating, approving, and modifying the contracts; and 3) CSTC-A benefited from MDDC's work knowing that it expected to be paid.  *Id*.  However, as alleged, none of these acts are sufficient to show the Government's intent to be contractually bound.

#### a. CSTC-A's Facilitating the Payment Process Does Not Show Intent as Alleged.

MDDC argues that each time CSTC-A "stepped in and facilitated payment by MOI to MDDC" and "use[d] its influence and authority to exert political and economic pressure on the MOI to get MDDC paid," the Government showed its intent to be MDDC's guarantor.  Pl.'s Am. Opp'n at 22.  However, "[t]he government's involvement in the financing and supervision of a contract between a public agency and a private contractor does not create a contract between the government and the contractor . . . ."  *D & N Bank*, 331 F.3d at 1379 (quoting *New Era Constr. v. United States*, 890 F.2d 1152, 1155 (Fed. Cir. 1989)).  Federal grants "to the various states, to municipalities . . . and to other public organizations and agencies . . . are in reality gifts or gratuities" that do not convey contractual intent.  *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 507 (Ct. Cl. 1967).  Funding projects within an agency's congressional mandate is a quintessential "sovereign act[]" in service of the public good that alone does not show intent to contract.  *Id*. at 508; *see also Park Props. Assocs., L.P. v. United States*, 916 F.3d 998, 1002–04 (Fed. Cir. 2019) (affirming and explaining line of precedent descending from *D.R. Smalley* that funding projects is a "sovereign act[] that did not subject the government to liability").  *Cf. Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("A grant of benefits and subsequent oversight

---

[2]   The contracts attached to the Complaint were written in Pashto and appear to have been translated in August 2022 to the English versions that MDDC provides.  Compl. at 24, 32.

by [a federal agency] is insufficient to establish a contractual obligation between" the contractor who ultimately receives the funds and the federal government.).

Therefore, the fact that CSTC-A funded MOI's projects through the ASFF is not itself evidence of mutual intent. These acts are analogous to the Government's funding of state highway projects or local housing authority developments, neither of which create implied contracts with the contractors who work on those projects. *See, e.g.*, *D.R. Smalley*, 372 F.2d at 507 (for funding state highway construction contractors); *Hous. Corp. of Am. v. United States*, 468 F.2d 922, 924 (Ct. Cl. 1972) (for funding developers contracting with local housing agencies).

Similarly, that CSTC-A made efforts to ensure that its funds went to the intended project is not enough to suggest intent to contract. "[A]n agency's performance of its regulatory or sovereign functions does not create contractual obligations" on its own. *D & N Bank*, 331 F.3d at 1378–79; *see also Lockheed Martin Corp. v. United States*, 48 F. App'x 752, 756–57 (Fed. Cir. 2002) (finding agency's use of a supervisory oversight board to ensure subcontractors followed regulations did not create contractual obligations because "[a]ctions taken to ensure these regulations are followed, by themselves, cannot form the basis of a contract"). Accordingly, supervision of federal funds is not sufficient to demonstrate intent. *See, e.g.*, *Aetna Cas. & Sur. Co. v. United States*, 655 F.2d 1047, 1052–53 (Ct. Cl. 1981) (affirming that setting standards for use of funds, "requir[ing] all work to be of a certain quality" and "inspect[ing] the work as it progressed" is insufficient to show intent); *Park Props.*, 916 F.3d at 1002–03 (affirming principle that mere supervision of funds is insufficient basis to show contractual intent).

MDDC alleges that CSTC-A was responsible for providing oversight, ensuring fiscal controls, and "managing the payment process on contracts." Compl. ¶ 11. For example, CSTC-A explained payment issues related to administrative holdups due to the MOF's need to allot funds. *Id*. ¶ 22. And CSTC-A raised billing issues and collaborated with MOI counterparts to resolve delays, including convening administrative meetings between Afghan and United States officials. *See, e.g.*, *Id*. ¶ 24–25, 47. However, this kind of supervision is not sufficient to show contractual intent. *See, e.g.*, *Park Props.*, 916 F.3d at 1002–03 (citing *D.R. Smalley* and *Hous. Corp*. to affirm that just because an agency "conceived, implemented, and supervised the project" does not create privity between a third-party contractor and the government). MDDC must offer more than mere allegations of "funding and regulating programs designed for the public good." *Turping*, 913 F.3d at 1067 (quoting *Dana Constr.*, 229 Ct. Cl. at 864).

      b.  **CSTC-A's Involvement in MOI's Contracting Process Does Not Show Intent.**

For the same reasons, CSTC-A's alleged involvement in managing MOI and MDDC's contracting process—including identifying MDDC as a contractor, requesting contract modifications, and approving contract extensions—is similarly insufficient to show contractual intent. The fact that "the government approved [a] contract" between a funding recipient and a third-party contractor does not create an implied contract—even when the agency "approved drawings, plans, and specifications, and made direct demands on the [contractor] for contract changes and agreed to pay for them." *Park Props.*, 916 F.3d at 1003 (citing *Hous. Corp.*, 468 F.2d at 923, 925). Thus, even if it is true, as MDDC contends, that "MOI would work with CSTC-A to develop contract requirements and terms, those requirements and terms would be

approved by CSTC-A, and then the contract would be funded by CSTC-A," this involvement does not allege intent to contract. Pl.'s Am. Opp'n at 8; *see also D.R. Smalley*, 372 F.2d at 507 (finding same when government drafted contracts and approved changes in plan).

Similarly, a federal agency's "mere approval" of a contract between two parties does not show intent to contract when the approvals constitute an exercise of the agency's sovereign or regulatory capacity. *See, e.g.*, *Suess v. United States*, 535 F.3d 1348, 1359–60 (Fed. Cir. 2008) (collecting Federal Circuit and Court of Claims precedent holding same). For example, as the court in *Suess* held, the government did not evince intent to guarantee the terms of a merger agreement between two parties when a federal agency which "in its regulatory capacity, must approve all mergers," voted to approve the parties' merger documents. *Id*. at 1361 (quoting *D & N Bank*, 331 F.3d at 1378–79) (cleaned up). Accordingly, even if "CSTC-A approved and facilitated all expenditures contracted" by MOD and MOI, this is insufficient to allege intent to contract. Compl. ¶ 11. *See also C & L Grp.*, 140 Fed. Cl. at 756 (agency confirming "funds [were] reserved" does not allege intent to contract).

That said, government approvals of other parties' contracts may "create[] contractual obligations by inserting . . . additional statement[s] mirroring" specific offers or requests. *Anderson*, 344 F.3d at 1356 (interpreting *Winstar v. United States*, 64 F.3d 1351, 1357–42 (Fed. Cir. 1995) (en banc), *aff'd*, 518 U.S. 839 (1996). Thus, MDDC could show intent by alleging that CSTC-A's contract approvals went beyond a "mere statement of regulatory approval" and provided a "manifestation of assent," responsive to offers from MDDC. *Anderson*, 344 F.3d at 1356.

While this assent may be found in a "confluence of multiple documents," *Suess*, 535 F.3d at 1359 (cleaned up), here neither the PAB Approval documents nor MDDC's express contracts with MOI contain promissory language suggesting CSTC-A incorporated or "mirrored" an offer of a separate contract of guarantee. "None of the [PAB approvals] purport[] to be a contract binding" upon CTSC-A and MDDC. *Suess*, 535 F.3d at 1360. Neither of the PAB approval documents mentions MDDC by name, referring only to the contract's description and details. Compl. at 20–21, 28. Nor do the express contracts between MDDC and MOI make any reference to CSTC-A or the United States. *Id*. at 22–26, 30–34. The 2019 PAB approval of eleven additional K9 teams assigns responsibility for requesting increased funding per "the President of Afghanistan's order" rather than to CSTC-A. *Id*. at 28.

Thus, the documents cited in the Complaint lack a "manifestation of assent" responsive to an offer by MDDC. *Anderson*, 344 F.3d at 1356. And, as discussed above, even if the PAB documents "obligated [CSTC-A] by separate agreements" to MOI "for the funding of approved projects . . . this does not create an express or implied contract between" the United States and MDDC. *Hous. Corp.*, 468 F.2d at 924; *see also Park Props.*, 916 F.3d at 1003.

### c.   MDDC Does Not Allege the United States Received Benefits and Recognized the Validity of a Demand for Payment.

Finally, MDDC argues that because "it was providing services in the Green Zone with the expectation of compensation," the Government impliedly intended to be bound by accepting its services. Pl.'s Am. Opp'n at 22. "An implied-in-fact contract may be created through the acceptance of benefits with the knowledge that the supplier expects to be compensated." *Chavez*, 18 Cl. Ct. at 545. But "the mere conferring of a benefit on the government does not create an implied-in-fact contractual relationship." *Id*. This kind of implied contract is present

in limited circumstances: when a plaintiff demands direct payment for its services, and the government "recognize[s] the validity of the plaintiff's claim for payment of the services and acknowledge[s] its obligation to pay compensation." *Id*.

In *Pacific Maritime Ass'n v. United States*, 123 Ct. Cl. 667 (1952), the Army repeatedly requested and directly used plaintiff's recruiting services during World War II. *Id*. at 671–72. The plaintiff submitted multiple oral and written requests that the Army pay plaintiff directly for the services it was providing, at a specific rate. *Id*. at 672–74. In response, Army officials acknowledged plaintiff's demand, and confirmed both in writing and orally that the requested rate was approved. *Id*. at 673–74. The Army began the process of drafting express contracts providing for monthly payments but never executed them. *Id*. at 674–75. The court found these actions were evidence that the Army accepted the validity of plaintiff's claims and were sufficient to show the Army's intent to form an implied contract with the plaintiff. *Id*. at 675–76.

Here, unlike *Pacific Maritime*, MDDC does not allege it made a demand for direct payment to the United States. Rather, MDDC alleges it contacted CSTC-A officials requesting "intervention" and "assistance to clear the path," shared "concern about MOI's payment delays," and sought "to solve the payment problem." *See, e.g.*, Compl. ¶ 24, 26, 36. This language suggests that MDDC recognized it was MOI's obligation to pay, and CSTC-A's involvement was limited to facilitating that process. Unlike *Pacific Maritime*, MDDC does not allege it asked CSTC-A for specific dollar amounts or rates. These facts further distinguish this case from *Laudes*, where the plaintiff alleged it sent unpaid invoices directly to the Department of Defense's Project Contracting Office. *Laudes*, 86 Fed. Cl. at 158–59.

Additionally, MDDC does not assert that CSTC-A officials acknowledged responsibility for MOI's failure to pay or indicated they could make payment unilaterally. In contrast to *Pacific Maritime*, MDDC's only written contract put responsibility on MOI to pay. *Contra Laudes*, 86 Fed. Cl at 158 (where the United States officials explicitly "assume[d] direct authority over the process of payment and the responsibility of deficiencies"). Additionally, other than implying that the United States' foreign policy goals were served by security in the Green Zone, MDDC does not allege that its performance directly benefited the United States— and in fact contradicts this argument in its Amended Opposition. Pl.'s Am. Opp'n at 36 (asserting the Government "did not benefit directly from the Contract").

Finally, the fact that CSTC-A funded MDDC indirectly through an intermediary further distinguishes this case from *Pacific Maritime*. Courts have applied *Pacific Maritime* in situations that lacked an intermediary party and involved direct payment from the United States. *See, e.g.*, *Johnson Controls World Servs., Inc. v. United States*, 44 Fed. Cl. 334, 348 (1999) (finding plaintiff adequately alleged a meeting of the minds under the standards described in *Pacific Maritime* in part because plaintiff "did receive direct payments from the Air Force"); *Johnson Controls, Inc. v. United States*, 8 Cl. Ct. 359, 369 (1985), *aff'd sub nom. Johnson Controls v. United States*, 795 F.2d 1011 (Fed. Cir. 1986) (explaining that cases applying *Pacific Maritime* involved plaintiffs who "were in the position of prime contractors" and there was no "issue of where the plaintiffs were to turn for payment"). In contrast, cases in which third-party

contractors are being paid by a federal funding recipient have not applied *Pacific Maritime*. *See, e.g.*, *Park Props.*, 916 F.3d at 1002–04; *Dana Constr.*, 229 Ct. Cl. at 864.

### 3. MDDC Does Not Plead an Implied Contract.

Since MDDC does not meet its burden to allege non-conclusory facts sufficient to establish the Government's intent to contract, the Complaint fails to state a plausible claim for breach of an implied contract. *See, e.g.*, *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384 (Fed. Cir. 2019). Therefore, it is unnecessary to address the Government's additional arguments that MDDC did not adequately allege the other contract elements. Mot. to Dismiss at 25–31. Regardless, the Court notes that MDDC's failure to allege facts showing intent suggests it may also fail on other elements for which the legal analyses overlap, such as offer, acceptance, and consideration. *See, e.g.*, *Turping*, 913 F.3d at 1065–66 (explaining mutuality of intent requires "the existence of an offer and a reciprocal acceptance" even in an implied contract) (citing *Anderson*, 344 F.3d at 1353); *Crewzers Fire Crew*, 741 F.3d at 1382 ("[A] contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness" to be valid) (quoting *Ace-Fed. Reps., Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000)).[3]

### B. MDDC Does Not Adequately Plead a Guarantee Under the Arms Export Control Act.

In the alternative, Count II of MDDC's Complaint alleges "breach of an implied-in-fact contract to guarantee [MDDC] against political and credit risks of nonpayment by [MOI]." Compl. ¶ 73. In support, MDDC relies on an Arms Export Control Act ("AECA") provision, 22 U.S.C. § 2764(a). Compl. ¶ 78; Pl.'s Am. Opp'n at 44–45. The provision states that:

> The President may guarantee any individual, corporation, partnership, or other juridical entity doing business in the United States (excluding United States Government agencies other than the Federal Financing Bank) against political and credit risks of nonpayment arising out of their financing of credit sales of defense articles, defense services, and design and construction services to friendly countries and international organizations. Fees shall be charged for such guaranties.

22 U.S.C. § 2764(a).

MDDC does not plead facts regarding such a guarantee or otherwise explain the applicability of the AECA. The language and regulatory implementation of this statute suggest it applies only to entities providing financing for a foreign state or an organization's purchase of defense articles and services, not the provision of the services. Sections 2763 and 2764 of the AECA "authorize[] the U.S. Government to extend direct loans and guaranteed loans for financing of both government-to-government and commercial foreign military sales." Anthony Perfilio, *Foreign Military Sales Handbook* § 7:2 (2023). The AECA authorizes the President to guarantee against the political and credit risks of nonpayment "when a [Foreign Military Sales]

---

[3] In addition, the Court does not address the Government's contention that agreements to guarantee or indemnify an express contract must be in writing.

13

contract is financed on a credit basis and the credit source is not the U.S. government." *Id*. § 7:7 ("Guaranteed Loans").

Guidance from the Defense Security Cooperation Agency ("DSCA"), which implements the Foreign Military Sales ("FMS") program of the AECA, emphasizes that § 2764's guarantee is applicable to entities that finance a foreign country's purchase of covered FMS articles and services. *See, e.g.*, DSCA Security Assistance Management Manual ch. 9 § 3.3 (explaining that § 2764 applies to "financing" by non-United States government actors "if such financing is in connection with FMS or Direct Commercial Sales (DCS) of defense items"); § 7.2, 7.2.2 (stating that when an "FMS purchase cannot be financed by other means, credit financing or credit guarantees can be extended" under a variety of provisions, including § 2764). *See also* 32 C.F.R. § 274, 274.4 (Department of Defense regulations implementing § 2764 and describing how "financial institutions" may bid on the interest rates for guaranteed loan agreements).

Other than frequently providing security services without pay, the Complaint does not allege facts to show MDDC was "financing" the Afghan government or establish the Afghan government's purchases on credit. Nor does Kabul-based MDDC allege facts that it is "doing business" in the United States, or the United States charged a "fee" for its purported guarantee under the statute. And as discussed, MDDC pleads no facts alleging the formation of a plausible implied contract. MDDC theorizes that it is "quite plausible that when CSTC-A engaged with MDDC and the MOI to broker and guarantee MDDC's provision of K9 teams . . . CSTC-A offered MDDC certain guarantees as permitted by the AECA." Pl.'s Am. Opp'n at 45. The existence of the statute authorizing the kind of guarantees MDDC seeks does not solve the Complaint's failure to sufficiently allege the elements of a contract. Since the AECA is inapplicable and MDDC does not otherwise plead facts showing it satisfies the requirements, it fails to state a claim under Count II.

## V. Conclusion

MDDC alleges that it worked for months on end without payment, providing what appear to be satisfactory and admirable security services in a complicated and dangerous environment. MDDC was part of a system of Afghan third-party contractors who were paid for, supervised by—and seemingly relied on the involvement of—the United States' military presence. But MDDC contracted with Afghanistan, not the United States. Accordingly, the Court **GRANTS** the Government's Motion to Dismiss without prejudice and directs the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge